**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Sandeep Satwalekar**
**Jacob David Zetlin-Jones**
**William Conway**
**Nicholas Karasimas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0978 (Zetlin-Jones)**
**zetlinjonesj@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>-against-<br><br>**THOMPSON HUNT AND ASSOCIATES, LTD., CARL ARNAL a/k/a MICHAEL J. COHEN, CHRISTOPHER VAUGHAN, BROOKDALE CONSULTANTS LLC, GROWTH POINT CONSULTANTS, INC., DAMON ARTIS, AND RICHARD GAVZIE,**<br><br>Defendants. | **COMPLAINT**<br><br>24 Civ. 6035 (    )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants Thompson Hunt and Associates, Ltd. ("Thompson Hunt"), Carl Arnal a/k/a Michael J.

Cohen ("Arnal"), Christopher Vaughan ("Vaughan"), Brookdale Consultants LLC ("Brookdale"),

Growth Point Consultants, Inc. ("Growth Point"), Damon Artis ("Artis"), and Richard Gavzie

("Gavzie") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      This action concerns two fraudulent schemes, each carried out through unregistered boiler room entities owned and controlled by Defendant Artis and the sales agents he employed, through which Defendants Arnal and Vaughan misappropriated approximately $1 million, and Defendants Artis and Gavzie pocketed millions more in undisclosed sales commissions, on the backs of defrauded, primarily elderly investors. This is not the first time Defendants Artis, Gavzie and Arnal have violated securities laws, committed fraud, or misappropriated funds—as detailed below, each has been subject to prior civil (Artis) or criminal (Gavzie and Arnal) proceedings on account of their past fraudulent activities.

2.      The first scheme (the "Microcap Fraud") involved the fraudulent sale of thinly-traded penny stocks in microcap companies by Defendant Growth Point, a private company Artis owned and controlled. Growth Point primarily marketed and sold these penny stocks on behalf of third-party sellers who had obtained their shares at virtually no cost.

3.       Between June 2016 and September 2023 (the "Relevant Period"), Growth Point's sales agents—who were required to be, but were not, associated with a brokerage firm registered with the SEC—including Defendant Gavzie, employed high pressure sales tactics to induce investors, primarily senior citizens, to buy these penny stocks at prices exponentially higher than the sellers' acquisition costs, with the understanding that Growth Point would receive a share of the sellers' profits through significant sales commissions. Using scripts Artis approved, Growth Point sales agents generally touted the microcap companies as up-and-coming and the shares as likely to double or triple in value in the near term. However, Growth Point, Artis and Gavzie failed to disclose that they would be receiving substantial commissions (upwards of 30%) from the sales, which rendered their recommendations materially misleading. Among other misrepresentations, Artis, Gavzie and other Growth Point sales agents also fraudulently misrepresented that the shares

they were offering were being sold by the companies themselves (the issuers), and exaggerated investor interest in these penny stocks.

4.     In total, during the Relevant Period, Artis and Gavzie, through Growth Point, generated nearly $7 million in proceeds from the sales of these penny stocks and collectively received at least $2.7 million in undisclosed commissions as a result.

5.     The second scheme (the "Thompson Hunt Offering Fraud") involved the fraudulent offering of unregistered securities issued by Defendant Thompson Hunt—a private corporation purportedly in the business of issuing, selling, and managing bonds collateralized by government-backed securities—through its Chairman and Founder, Defendant Arnal, and its Chief Executive Officer ("CEO"), Defendant Vaughan, and subsequent misappropriation of the offering proceeds.

6.     Although Thompson Hunt's sole business function was purportedly the issuance and management of these asset-backed bonds, it has never successfully brought a bond to market and never generated any revenue. In or around June 2021, ostensibly to support its purported efforts to issue its bond, Arnal and Vaughan launched an unregistered securities offering.  The Thompson Hunt investment contract promised investors that their funds would be used for a "[c]ash injection to [Thompson Hunt] to maintain [Thompson Hunt's] infrastructure and business enterprise," and that their investment in Thompson Hunt would generate returns of at least 300% within six months. In connection with the offering, Arnal and Vaughan prepared offering and marketing materials that included several misstatements about the operational status of Thompson Hunt, its product, and its management, including that (a) Thompson Hunt's bond offering was highly rated by a nationally recognized credit rating agency; (b) Thompson Hunt had a patent pending on its supposed bond structure; and (c) Thompson Hunt's founder was not Arnal, but "Michael Cohen," an alias Arnal used to conceal his prior criminal indictment and guilty plea for a fraudulent insurance scam.

7.     Thompson Hunt engaged Artis to market the unregistered Thompson Hunt offering through Defendant Brookdale, another boiler room entity Artis founded and owned. Artis, in turn, used Gavzie as the primary sales agent to solicit investments in the Thompson Hunt offering. In exchange, Thompson Hunt agreed to pay Brookdale significant commissions from the proceeds of all sales of the Thompson Hunt securities. In pitching prospective investors on the Thompson Hunt offering, Gavzie—at Artis's direction—disseminated the false and misleading offering materials Arnal and Vaughan had prepared, and compounded these misrepresentations with additional materially misleading statements, including by falsely referring to the investment at times as a "government bond," and concealing the substantial up-front commissions.

8.     Between June 2021 and March 2023, Brookdale fraudulently induced approximately 30 investors to buy these unregistered Thompson Hunt securities, raising approximately $1.3 million in proceeds. Contrary to the offering materials' representations, the majority of the funds raised were not used to fund Thompson Hunt's business and infrastructure. Instead, Thompson Hunt misappropriated nearly $1 million of the funds raised, diverting them for unrelated purposes, including making Ponzi-like payments to earlier investors, paying legal fees for Arnal's friend, and authorizing the funding of approximately $337,687 in undisclosed commissions.

9.     Through both schemes, Growth Point, Artis, and Gavzie directly received approximately $1.8 million, $950,000, and $320,000 in commissions, respectively.

10.    As a result of the conduct described herein, the Commission seeks monetary and injunctive relief, as described in more detail below.

## VIOLATIONS

11.    Through the conduct alleged above and as alleged further here:

   a.   Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b.  Defendants Thompson Hunt, Arnal, Vaughan, Brookdale, Artis and Gavzie have violated Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)];

c.  Defendants Brookdale, Growth Point, Artis and Gavzie have violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];

d.  Defendant Arnal aided and abetted Defendant Vaughan's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

e.  Defendant Vaughan aided and abetted Defendant Arnal's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

f.  Defendant Gavzie aided and abetted Defendant Thompson Hunt's, Arnal's and Vaughan's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and

g.  Defendant Artis aided and abetted Defendants Thompson Hunt's, Arnal's, Vaughan's and Gavzie's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and, as a control person of Brookdale and Growth Point, is liable for Defendants Brookdale's and Growth Point's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

12.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions and courses of business set forth in this Complaint or in acts, practices, transactions and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.     The Commission brings this action by the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

14.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants Thompson Hunt, Arnal, Brookdale, Growth Point, Artis (individually and on a joint and several basis with Growth Point and Brookdale) and Gavzie to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7), [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants Artis and Gavzie from participating in any offering of a penny stock, pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; (e) permanently prohibiting Defendants Artis, Arnal and Vaughan from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

16.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices and courses of business alleged herein.

17.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Defendants transact business in the Southern District of New York, and certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within this District. During the Relevant Period, among other things, Thompson Hunt held itself out as headquartered in New York, New York, and Growth Point solicited investors by email and telephone, including at least some investors who reside in this District, and maintained a bank account at a financial institution based in this District.

## DEFENDANTS

18.     **Growth Point** is a Delaware corporation formed in 2010 with its principal place of business in San Diego, California. Growth Point is owned and controlled by Artis and is not registered with the Commission in any capacity. Although Growth Point is a corporation and not a natural person, in the Commission staff's investigation preceding the filing of this action, Growth Point purported to assert a claimed Fifth Amendment privilege against self-incrimination in response to a subpoena for documents and refused to produce any documents to the Commission staff.

19.     **Artis**, age 47, is a resident of El Cajon, California. Artis is not and has not been registered with the Commission in any capacity and holds no securities licenses. Artis is the sole owner and President of Growth Point and Brookdale. In 1997, the Securities Division of the

Virginia State Corporation Commission brought an action against Artis, finding that he transacted business as an unregistered sales agent for a boiler room and offered and sold unregistered securities. Artis was permanently enjoined from future violations and fined $48,000. In the Commission staff's investigation preceding the filing of this action, Artis asserted his Fifth Amendment privilege against self-incrimination in response to subpoenas for documents and testimony.

20.    **Gavzie**, age 61, is a resident of Coronado, California. Gavzie is not currently licensed or registered with the Commission in any capacity. From March 1990 to July 1995, Gavzie was associated with multiple broker-dealers and held Series 7 and 63 licenses. At various times between 2016 and the present, Gavzie has acted as a salesman for Growth Point and Brookdale. In 2006, Gavzie pled guilty to criminal charges, including wire fraud in connection with the operation of a boiler room, for which Gavzie was sentenced to twelve months of incarceration and ordered to pay $875,665 in restitution. In the Commission staff's investigation preceding the filing of this action, Gavzie asserted his Fifth Amendment privilege against self-incrimination in response to subpoenas for documents and testimony.

21.    **Brookdale** is a California limited liability company formed in May 2021 with its principal place of business in El Cajon, California. Brookdale is owned and controlled by Artis and is not registered with the Commission in any capacity.

22.    **Thompson Hunt** is a private Arizona company that held itself out as being headquartered in New York, New York, with its principal place of business in Tucson, Arizona. Neither Thompson Hunt nor its securities are registered with the Commission in any capacity. Thompson Hunt was formed by Arnal in 2009 and, since at least 2017, has purported to exclusively be in the business of attempting to issue and manage a securitized asset-backed bond collateralized by government-sponsored mortgage-backed securities.

23.    **Arnal**, age 66, is a resident of Tucson, Arizona. Arnal is not and has not been

registered with the Commission in any capacity and holds no securities licenses. Arnal is the founder and Chairman of Thompson Hunt. In June 2003, Arnal was indicted in Arizona state court on four counts of theft by conversion and one count of fraudulent scheme and artifice. In December 2005, Arnal pled guilty to one felony count of theft of conversion and was ordered to pay over $960,000 in restitution to victims, upon payment of which, the indictment against him was dismissed with prejudice. Since his indictment and guilty plea, Arnal has frequently used the alias "Michael J. Cohen" in business contexts.

24.     **Vaughan**, age 66, is a resident of Tucson, Arizona. Vaughan is not and has not been registered with the Commission in any capacity and holds no securities licenses. Since 2018, Vaughan has been the President and CEO of Thompson Hunt.

## OTHER RELEVANT INDIVIDUAL AND ENTITIES

25.     **Arch Investments LLC ("Arch Investments")** was a Delaware limited liability company formed in 2016 with its principal place of business in Gainesville, Florida. Arch Investments has never been registered with the Commission in any capacity. Arch Investments is wholly owned and controlled by Janusz (John) Zukowski ("Zukowski") but has been inactive since 2021. Before 2021, Arch Investments functioned as the corporate vehicle through which Zukowski obtained, controlled, and disposed of shares of thinly-traded microcap securities. For at least a year, Arch Investments purported to employ Artis directly to assist in its sale of Zukowski's holdings.

26.     **Zukowski**, age 44, is a resident of Gainesville, Florida. From 2016 to 2021, Zukowski used Growth Point to sell his shares (owned through Arch Investments) in thinly-traded microcap securities. Zukowski has never been registered with the Commission in any capacity or held any securities licenses. In June 2024, without admitting or denying the Commission's findings, Zukowski settled to an administrative order finding that he made material misrepresentations to investors in connection with his sale of Arch Investments' microcap securities holdings through

Growth Point, thereby violating the antifraud provisions of the Securities Act and Exchange Act. *See In re Janusz (John) Zukowski and Jerry Samaras*, Securities Act Release No. 11290 (June 13, 2024).

27.     **Law Firm A** is a professional corporation formed in 2013 with its principal place of business in San Diego, California. Law Firm A is a small law firm headed by a licensed attorney in California.

28.     **Law Firm B** is a professional limited liability company formed in 2013 with its principal place of business in Gainesville, Florida. Law Firm B is a small law firm headed by a licensed attorney in Florida.

<center>**FACTS**</center>

**I.      THE MICROCAP FRAUD**

**A.      Background on Growth Point's Boiler Room and Unregistered Broker Dealer Activities**

29.     Artis founded Growth Point in 2010 and has at all times been its President and sole owner.

30.     Since at least 2013, Artis has run Growth Point as a boiler room, its business model predicated upon earning transaction-based compensation (e.g., commissions) principally through the re-sale of highly illiquid penny stocks in the secondary market.

31.     Artis engaged a team of sales agents, at times as many as four, to work on behalf of Growth Point to market these penny stocks. Artis and these sales agents did so through cold calls to lists of potential, generally elderly investors.

32.     Artis oversaw all operations of Growth Point and its salesmen, and was responsible for hiring, training and supervising Growth Point's sales force. Artis determined which securities Growth Point would pitch to its client base and tightly scripted Growth Point's sales agents' email and telephonic communications with potential investors concerning the stocks Growth Point

marketed.

33.    As a Growth Point sales agent, Gavzie reported directly to Artis.

34.    During the Relevant Period, at Artis's direction, Growth Point and its sales agents

(including Gavzie) solicited investments in at least 11 microcap stocks at various times, as reflected

in the following chart:

| Company[1] | Approximate Dates of Selling Activity | Amount Growth Point and its Sales Agents Raised from Investors |
|---|---|---|
| IVBT | March 2017 – June 2018 | At least $1,448,500 |
| AVAI | Sept. 2020 – Aug. 2023 | At least $1,186,415 |
| SKYI | Dec. 2016 – July 2022 | At least $1,184,251 |
| COFE | March 2017 – Feb. 2020 | At least $900,075 |
| FTWS | Aug. 2016 – Dec. 2016 | At least $821,400 |
| VSBC | Feb. 2022 – Feb. 2023 | At least $388,500 |
| IRME | May 2022 – Jan. 2023 | At least $378,756 |
| NUKK | June 2016 – Nov. 2018 | At least $100,700 |
| CSUI | Aug. 2019 – Jan. 2020 | At least $46,500 |
| EGBB | Sept. 2021 | At least $20,000 |
| USBC | April 2023 | At least $10,000 |
| Total | | At least $6,485,097[2] |

---

[1] Certain of these microcap companies changed names and traded under different symbols during the Relevant Period. This table refers to the latest ticker symbol used by each issuer listed.

[2] Growth Point raised an additional $464,775 from investors during the Relevant Period, which, based on the pattern of the flow of funds, can reasonably be inferred were for investments in microcap securities—likely the same securities identified above.

35.     Investors whom Growth Point salesmen convinced to purchase penny stocks typically executed the transactions by signing a stock purchase agreement that Growth Point provided.

36.     These stock purchase agreements generally contained identical provisions and disclosures, conformed to the specifics of each transaction—e.g., the issuer, the counterparty to the sale, and the number and price of the shares to be sold.

37.     During the Relevant Period, neither Artis nor any of the Growth Point sales agents he supervised, including Gavzie, was associated with a registered brokerage firm or held a securities license.

38.     From approximately June 2016 to March 2020, the microcap stocks Growth Point marketed through its sales force were held by an unregistered investment firm, Arch Investments, which had generally obtained its stocks in the relevant issuers directly from shareholders to whom the issuers had directly granted stock, pursuant to a Form S-1 registration statement, at a negligible cost.[3]

39.     Growth Point marketed these stocks on behalf of Arch Investments at a price often thousands of times greater than what Arch Investments had paid to acquire them, with the understanding from Zukowski, Arch Investments' principal, that Growth Point and its sales agents would retain commissions of approximately 35% of the proceeds of any sales they made. Growth Point, Artis and Gavzie did not disclose the commissions to investors.

40.     For example, in or around March 2017, Zukowski engaged Artis to market approximately 4.6 million shares of The Coffeesmiths Collective Inc., then trading under the symbol "DCSA" (and later trading under the symbol "COFE"), an over-the-counter traded public company

---

[3] A Form S-1 registration statement is the initial registration form that issuers are required to file with the SEC to register and publicly offer new securities.

in the business of investing in and selling coffee and coffee-related products. Arch Investments had acquired these COFE shares from the company's Form S-1 shareholders for $6,250—approximately $0.0014 per share. Growth Point solicited prospective investors to purchase Arch Investments' shares at prices generally between $0.01 and $1.67 per share, at a profit of between 614% and 119,185% on each sale.

41.     Growth Point was able to sell more than 1.8 million COFE shares for Arch Investments to investors through Growth Point's cold call solicitations between March 2017 and February 2020. Growth Point thereby raised more than $900,000 from investors, many of whom were elderly, and received a substantial portion of those proceeds in commissions.

42.     Investors who agreed to purchase shares that Growth Point marketed on behalf of Arch Investments were instructed to transfer their funds directly to Arch Investments or to Law Firm B acting as Arch Investments' escrow agent.

43.     Between June 2016 and March 2020, investors solicited by Growth Point or its sales agents sent approximately $3.69 million into Arch Investments' account and approximately $297,500 into Law Firm B's account. Many of the corresponding checks or wire transfer records included descriptions in their memo field identifying the name of the stock the investor agreed to purchase.

44.     For example, on March 3, 2017, an investor Growth Point had solicited sent $20,000 to Arch Investments with a memo line indicating the funds were for the purchase of 57,143 shares of a penny stock company called Sky Century Investment, Inc., then trading under the symbol "BNRM" (and later trading under the symbol "SKYI").

45.     In another example, on February 3, 2020, an investor Growth Point had solicited sent $5,000 to Arch Investments with a memo line indicating it was for the purchase of 50,000 shares of COFE.

46.     Of the approximately $4 million in investor funds deposited with Arch Investments

and Law Firm B, approximately $1,407,712—about 35%—was returned to Growth Point and Artis as commissions.

47.     From September 2020 through at least August 2023, Growth Point marketed microcap company shares on behalf of other third-party individuals in addition to Arch Investments.

48.     Like Arch Investments, these individuals typically obtained their shares in these penny stock companies at nominal or no cost, and Growth Point was compensated through exorbitant commissions from the stock sales it made at exponentially higher prices.

49.     When Growth Point solicited prospective investors on behalf of these sellers, its sales agents generally instructed investors who agreed to purchase shares to send their funds to an escrow account maintained by Law Firm A, which worked with Growth Point and which purported to act as escrow agent for these stock purchases. Law Firm A would then send Growth Point its agreed-upon commissions from this attorney escrow account, with the remaining proceeds (less fees retained by the law firm for its services) forwarded to the individual seller.

50.     Between September 2020 and August 2023, investors solicited by Growth Point sent approximately $2.95 million to Law Firm A. As with investor funds sent to Arch Investments, many of the checks or wire transfer records corresponding to the investor funds sent to Law Firm A included descriptions in their memo field identifying the name of the stock the investor agreed to purchase.

51.     For example, on or about November 2, 2021, an investor Growth Point had solicited sent $25,000 to Law Firm A's escrow account with a memo line indicating it was for the purchase of 33,000 shares of a microcap company called Trend Innovations Holding, Inc., then trading under the symbol "TREN."

52.     As another example, on or about July 27, 2022, an investor Growth Point had

solicited sent $25,000 to Law Firm A's escrow account with a memo line indicating it was for the purchase of SKYI.

53.     Of the $2.95 million investors sent to Law Firm A, approximately $1,344,199—about 46%—was returned to Growth Point, Artis and/or Gavzie as commissions.

54.     In total, during the Relevant Period, Growth Point solicited investments in at least 11 stocks, selling millions of shares of these illiquid penny stocks for total proceeds of nearly $7 million on behalf of Arch Investments and other third-party shareholders. Of this nearly $7 million in sales proceeds, which was funneled through Arch Investments and the two law firm escrow accounts, Growth Point, Arch, and Gavzie collectively received over $2.75 million in commissions.

55.     During the Relevant Period, Gavzie, at Artis's direction, cold-called dozens of prospective investors to pitch them on purchasing many, if not all, of the stocks listed in paragraph 34, above.

56.     At Artis's direction, Gavzie typically sent these investors stock purchase agreements and instructed them on how to make the purchases.

57.     Independent from his direction of Gavzie's solicitations, Artis independently cold-called dozens of prospective investors to pitch them on purchasing the penny stocks listed in paragraph 34, above.

58.     By virtue of their regular solicitation of investors, their advising as to the merits of particular securities, and receipt of transaction-based compensation, among other things, Gavzie and Artis operated as unregistered brokers.

    **B.    Fraudulent Devices and Misrepresentations in the Offering of Microcap Stock**

59.     At Artis's direction, Gavzie and other Growth Point sales agents solicited investors to purchase these microcap stocks through aggressive sales tactics, unrealistic performance projections and serial deceptions.

60.     Investors that purchased securities through Growth Point and the sellers on whose behalf it sold securities often received their shares of these penny stocks in paper, certificate form.

61.     Because these securities were low-priced and thinly traded, and because many of their issuers were shell companies, companies that lacked current SEC filings, and/or companies that had no apparent business, revenue, or products, many of these investors were unable to deposit their shares with a registered broker and thus were unable to sell or otherwise dispose of the shares they purchased through Growth Point at all.

62.     Of those investors who were able to deposit their shares, many were unable to sell them, or had to sell them at a significant loss, because of the lack of demand and/or liquidity for these penny stocks.

63.     Most investors recruited by Growth Point to purchase microcap stock have not made any profit and continue to hold shares that are, effectively, untradeable and worthless.

64.     Growth Point, through its salesmen, including Artis and Gavzie, induced investors' purchases of these microcap stocks through a series of deliberate falsehoods and misrepresentations.

### 1.    Materially False or Misleading Statements and Omissions About Growth Point's Commissions

65.     Growth Point salesmen, including Artis and Gavzie, never disclosed their economic interest in the transactions—*i.e.* that they would keep upwards of 30% of any sales proceeds as commissions.

66.     Rather, during the Relevant Period, Artis, Gavzie and other Growth Point sales agents generally told prospective investors that the proceeds of their investments would be used to purchase the offered shares, which was false or misleading because at least 30% of investor proceeds would be taken off the top to pay Growth Point's up-front commissions and would not be put toward the purchase of shares.

67.     When soliciting investments, Growth Point, Artis and Gavzie typically quoted the

securities to the prospective investors on a price-per-share basis (e.g., $0.30 per share), without reference to any commissions or other transaction fees.

68.    The stock purchase agreements used by Growth Point to memorialize and execute its sales of microcap stock similarly omitted any mention of any transaction fees or commissions and represented to investors that they would "pay the Seller the full Purchase Price [the amount the investor agreed to invest] for the Shares."

69.    On at least some occasions, Gavzie falsely told investors orally that he did not earn any up-front commissions, but rather made money only if and when investors profited from their investments.

70.    As a result of these representations, investors understood that their funds were being used to buy shares—and not to compensate Growth Point and its sales force through significant commissions.

71.    Investors' understanding that Growth Point was not retaining investor funds as commissions was important to their decision to invest in the stocks Growth Point marketed.

72.    Had investors known the truth—that Growth Point was keeping 30% or more of their funds as commissions—many of Growth Point's investors would not have agreed to enter into the proposed transactions.

73.    In addition, the sales pitch used by Gavzie, Artis and other Growth Point salesmen working under Artis's oversight generally promised investors outsized returns in the penny stocks at minimal risk. Growth Point's salesmen, including Artis and Gavzie, portrayed the microcap issuers whose securities they offered as burgeoning growth companies. Their oral solicitations by phone sold potential investors on the opportunity to obtain equity interests in these purportedly up-and-coming businesses on the ground floor, which, they claimed, would yield substantial and imminent returns—typically forecasting to investors that the investment would earn multiples on their

investment within a year.

74.     Withholding and/or misrepresenting the fact that Growth Point and its sales agents were keeping upward of 30% of the sales proceeds as commissions rendered materially misleading Growth Point's and its sales agents' recommendations to purchase these securities and the purported bases for those recommendations (including statements about the potential growth prospects of these microcap companies and the potential investment returns). This is because investors were deprived of a critical data point, the sales agent's incentive, in evaluating the recommendation and, ultimately, making their investment decision.

> **2.     Materially False or Misleading Statements About the Source of the Shares That Growth Point Was Selling and the Uses of the Sales Proceeds**

75.     During the Relevant Period, Gavzie, Artis and other Growth Point salesmen falsely told investors that the offered shares would be or had been purchased directly from the issuers.

76.     Growth Point's website, the content of which Artis controlled and approved, represented that all of Growth Point's "[s]ales of securities are through the issuer or a registered broker-dealer." At Artis's direction, emails from Growth Point's salesmen to prospective investors contained a footer with identical language.

77.     In reality, neither Growth Point nor the sellers on whose behalf it sold stock were issuers, registered broker-dealers, or affiliated with registered broker-dealers.

78.     Artis and Gavzie compounded these misrepresentations to prospective investors verbally when soliciting investors by phone. Artis and Gavzie and other Growth Point salesmen, on at least some occasions, told investors that the shares offered were acquired directly from the issuer and/or were being offered by third parties (like Arch Investments) who had arrangements with the issuer such that sums invested would be used to fund the issuing company's operations.

79.     Gavzie and Artis also on occasion confirmed this misrepresentation in writing. For

instance, in April 2017, Gavzie emailed an investor confirming that "all stock u have acquired has been directly from the issuing companies."

80.    On another occasion, in December 2019, another unregistered and unlicensed Growth Point salesman, at Artis's direction and with Artis's approval, claimed that he was able to obtain a larger discount for the shares because the investor was an "angel investor"—i.e., an investor providing early-stage capital directly to emerging start-ups—further leading the investor to believe he was providing seed funding directly to the issuer.

81.    Based on these representations, investors understood that their investments would go to the issuers for corporate uses.

82.    This was important because investors believed the companies would use their funds to grow and develop their respective businesses which, in turn, would produce returns for the companies' investors.

83.    Had investors known that their investment funds were being directed to and retained by third-party investors unaffiliated with the issuers themselves, at least some investors would not have purchased shares in the companies.

84.    Artis and Gavzie each communicated with third-party sellers on whose behalf they were marketing the penny stocks. For example, each had multiple conversations with Zukowski in connection with Growth Point's disposition of Arch Investments' penny stocks.

85.    Artis and Gavzie each directed that the investor funds they raised be sent to the third-party sellers on whose behalf they were working (less Growth Point's and its sales agents' commissions), and not to the issuers.

86.    Artis and Gavzie each received transaction-based compensation pursuant to arrangements Growth Point had with third-party sellers, and not with the issuers of the stocks they were marketing.

87.     As a result of the communications and activities described in paragraphs 84 to 86 above, Artis and Gavzie knew or at least recklessly disregarded that, contrary to their representations, the shares offered by Growth Point were not obtained directly from the issuers and the funds invested did not go to the issuers, but rather were sold by unaffiliated third-party investors who profited exponentially from the prices Growth Point charged, and who shared a substantial portion of their profits with Growth Point as commissions.

### 3.     Materially False or Misleading Statements About Discounted Shares

88.     During the Relevant Period, Growth Point, Artis and Gavzie on at least some occasions represented to prospective investors in their telephonic solicitations that they were able to obtain, or had obtained, a large block of shares in these microcap securities from the issuers and, for that reason, were able to offer the shares at significant discounts to their market price.

89.     These representations were important to investors because they indicated to investors that they were paying approximately what the seller had paid to acquire the shares and that their share purchases carried near-term profit potential.

90.     These representations were false or misleading. As Artis, Gavzie and Growth Point's sales force knew or recklessly disregarded based on their communications with the third parties on whose behalf they were marketing the penny stocks, the shares had already been obtained by the sellers—in many cases months or years before Growth Point's solicitation—at nominal or virtually no cost, and, far from being discounted, the shares had been marketed by the seller and Growth Point at a price exponentially above what the sellers had paid to acquire the shares, in part to pay Growth Point, Artis and Gavzie substantial commissions.

91.     Indeed, as Artis, Gavzie and other Growth Point sales agents concealed from prospective investors, Growth Point, Artis and Gavzie would earn commissions of between 30% and 50% of the funds invested.

4.      **Examples of Growth Point's, Artis's and Gavzie's Deceptive Sales Tactics**

(a) **Investor A**

92.     On or around January 9, 2018, Artis solicited an investor ("Investor A"), an 81 year-old retiree through a cold-call to purchase stock in COFE by claiming to the investor that Growth Point had a block of 300,000 COFE shares available for resale from a seller, had received an indication of interest from a significant investor for 250,000 of those shares, and could offer the investor the opportunity to purchase the remaining 50,000 shares at $0.60 per share.

93.     In reality, Growth Point did not have any orders to purchase 250,000 shares from an investor, and the represented demand for the shares was non-existent. Nor did Growth Point have only a 300,000-share block of the stock available for re-sale. Rather, Growth Point was selling COFE shares on behalf of Arch Investments, which owned millions of COFE shares it had obtained for a fraction of a penny per share years earlier and which had been continuously attempting to liquidate these shares through Growth Point at vastly higher prices, which Artis never disclosed.

94.     Nor did Artis disclose to Investor A that Growth Point would receive approximately 30% or more of the $30,000 in investment proceeds as commissions on the sale.

95.     Shortly after Artis's solicitation, Investor A purchased 50,000 shares of COFE.

96.     In early December 2019, a Growth Point salesman solicited Investor A to make an additional purchase of COFE, and attached a proposed stock purchase agreement for the investor's signature by email.

97.     The shares offered were from the same block of shares held by the same seller, Arch Investments, as Growth Point's previous sales of COFE to Investor A.

98.     Investor A responded to the salesman's email, copying Zukowski, and conveyed his reluctance to purchase additional COFE shares given his age, the lack of trading volume in the

stock, and the size of his preexisting position in the stock after his previous purchases of the stock through Growth Point:

> I cannot see any reason for committing to buying more shares … when you look at the history of [COFE] and the lack of a market for trading these shares and the fact that I already have 381,249 shares and at the age of 82, I cannot see any true benefit based on the information that I am able to research, despite the comments that these shares are going to go to $2 per share soon and will be tradeable. I just have serious doubts that this will occur in my lifetime…. I appreciate that both of you have a vested interest in providing the needed funding to keep the COFE business viable going forward, but I think my current level of investment and risk does not warrant adding to this risk.

99.     Investor A also raised concerns in his email about risk disclosures contained in the stock purchase agreement Growth Point had sent him for the proposed transaction. Investor A noted, among other things, that the stock purchase agreement's risk disclosures described investments in the company as speculative and involving substantial risks and stated that the company might cease operations if unable to raise additional capital. The investor suggested to the Growth Point salesman and Zukowski that these risks rendered the investment unsuitable for his purchase.

100.     After Zukowski forwarded Investor A's email to Artis, Artis sent a text message to Zukowski detailing specific instructions on how to respond to the investor to induce his purchase. Artis directed Zukowski to remove the risk disclosures in the stock purchase agreement and to offer the stock at a lower price (but one still substantially higher than Zukowski had paid for the shares). Artis concluded his text message to Zukowski by stating "u do that, we will have the money next week. He does this every time. . . ."

101.     Later the same day, Zukowski emailed Investor A as Artis had directed (copying Artis) and attached a new stock purchase agreement that removed the risk disclosures that had concerned Investor A. Zukowski claimed that these disclosures about the speculative nature of the investment and the company's funding needs "should never have been in this stock purchase

agreement as it does not pertain to this company." As Artis had instructed, Zukowski also agreed to sell the shares for a lower price than Growth Point initially offered.

102.    Artis texted Zukowski back after that, saying: "Perfect email."

103.    About a week later, on December 10, 2019, Artis texted Zukowski to confirm that the investor was "doing the 50k. But I got to sign a personal guarantee [t]hat he can deposit his shares and make a profit… I'm desperate."

104.    Later that day, a Growth Point salesman forwarded the investor a document signed by Artis stating: "I, Damon Artis, Guarantee that your COFE shares will be able to sell and that they will be profitable by the end of February 2020. If not, I will buy back the shares @ .30/share. I guarantee you will make a profit above the purchase price of $0.30/share."

105.    Based on this representation, on December 13, 2019, the investor purchased an additional 176,667 COFE shares from Growth Point for $50,000 (approximately $0.30 per share), a significant percentage of which Growth Point or its agents stood to receive in commissions.

106.    The investor was never able to deposit or sell any of these shares, and notwithstanding his guarantee, Artis did not buy them back.

**(b) Investor B**

107.    On or around September 10, 2020, Gavzie called a prospective investor ("Investor B") to solicit his purchase of SKYI, a thinly traded penny stock in the marijuana industry.

108.    Gavzie targeted this investor because the investor had previously purchased microcap stocks recommended by Growth Point through other Growth Point salesmen.

109.    During the phone call, Gavzie told this investor that SKYI was an up-and-coming company likely to triple in value within six months to a year and offered the investor the opportunity to purchase the stock at $0.10 per share.

110.    Investor B explained to Gavzie that he had lost money on his previous investments

with Growth Point and could not afford to lose any more. He also told Gavzie that his previous stock purchases through Growth Point had been received in physical stock certificates that he had been unable to deposit with brokers for resale.

111.    In response, Gavzie assured Investor B that he was looking out for the investor's best interest and that the investor would not lose any money on the trade and falsely told the investor that Gavzie himself had purchased "big blocks" of SKYI.

112.    Gavzie did not inform the investor that Growth Point would retain approximately 45% of the funds Investor B invested in the stock as a commission.

113.    Based on Gavzie's representations, Investor B agreed to purchase 50,000 shares of SKYI for $5,000 on the condition that the shares be transferred to him electronically and not in certificate form, to which Gavzie agreed.

114.    The following day, Investor B mailed a check and an executed stock purchase agreement for his purchase of the shares to Gavzie. He included in his mailing a handwritten note to Gavzie explaining that he "trusted" Gavzie, writing further: "I am not an accredited investor. I cannot afford to lose money any more. Please help me. I have lost all my retirement and much more to scam ideas…"

115.    The stock purchase agreement Investor B entered into falsely listed the seller as an individual SKYI shareholder. In fact, the identified seller under the stock purchase agreement did not own SKYI shares at the time of the sale and was not the real selling party to the transaction.

116.    Only in November 2020—months after the investor had executed the transaction and paid for the shares—did Gavzie and Growth Point secure the SKYI shares for delivery to Investor B. Gavzie obtained the shares not from the listed seller, but rather from Arch Investments, which in turn had purchased the SKYI shares from a third party in November 2020 for approximately $0.01 per share, or ten times less than the investor paid.

24

117.    On or around September 21, 2020, Gavzie called Investor B again to pitch an investment in another penny stock traded in the over-the-counter market under the ticker symbol "TREN."

118.    During the call, Gavzie offered the stock to Investor B at $1.50 per share, again assuring the investor that it was a safe investment likely to triple in value within a year.

119.    Gavzie did not disclose to Investor B that Growth Point would retain approximately 45% of any funds invested as a commission.

120.    Investor B agreed to purchase 5,000 shares of TREN for $7,500 ($1.50 per share), again conditioned upon receiving the shares in electronic, and not certificate, form, which Gavzie agreed to.

121.    On or around October 27, 2020, Gavzie called the investor to solicit him to purchase additional shares of both penny stocks he had previously purchased—SKYI and TREN—and recommended that Investor B place as much money as possible in these stocks to maximize his profits.

122.    Again, Gavzie touted the investment merits of the stocks and the likelihood that their value would triple in the near term.

123.    Again, Gavzie withheld from Investor B his and Growth Point's economic interest in the transaction of approximately 45% commissions on any sale.

124.    On approximately October 30, 2020, the investor agreed to invest an additional $10,000 to purchase 50,000 more shares of SKYI at $0.10 per share and 3,333 shares of TREN at $1.50 per share, provided that the shares would be delivered to him in electronic, and not certificate form, to which Gavzie agreed.

125.    The investor returned a check for $10,000 and two signed stock purchase agreements to Gavzie by mail, along with a handwritten note to Gavzie. In his handwritten note, Investor B

explained to Gavzie that he was broke and had to borrow money to fund the purchase from a line of credit that was now down to $300. He told Gavzie that he was "counting + trusting you."

126.    Contrary to Gavzie's assurances, Growth Point did not deliver the stock to Investor B in electronic form, but rather sent stock certificates for each of the shares purchased.

127.    Investor B was unable to find a broker to accept the SKYI shares in certificate form and has, accordingly, been unable to deposit or resell those shares.

128.    On January 21, 2021, Gavzie called Investor B again to solicit an additional purchase of TREN shares.

129.    During the phone call, Investor B expressed significant reservations about further investments given that his prior purchases had not been delivered in the electronic form promised, that he had lost money on his Growth Point investments to date, and that he had incurred significant debt already to fund the investments Gavzie had previously recommended.

130.    Gavzie assured Investor B that the stock was "really hot right now" and that further investment would maximize his profit potential.

131.    Gavzie again omitted reference to the outsized commissions that Growth Point stood to earn on the sale.

132.    On Gavzie's advice, Investor B agreed to purchase an additional 1,333 shares of TREN for $2,000 and mailed a check for that amount, along with an executed stock purchase agreement, to Gavzie on or about January 25, 2021.

133.    Growth Point never transferred or delivered to Investor B the 1,333 shares he purchased. Despite repeated requests, Gavzie has not provided the investor any assistance in obtaining those shares.

134.    In total, Investor B sent approximately $27,500 to acquire shares in the penny stocks Gavzie recommended, a significant percentage of which was used to pay Growth Point or its agents'

(including Gavzie's) commissions.

## II.    THE THOMPSON HUNT OFFERING FRAUD

### A.    Background on Thompson Hunt

135.    Arnal founded Thompson Hunt as a private corporation in 2009.

136.    Since Thompson Hunt's inception, Arnal has been the Chairman of the company's Board of Directors.

137.    Since approximately 2017, Thompson Hunt's sole business function has been to attempt to issue and manage the "GNMAG Asset Backed Securitizations Trust" ("GNMAG Bond"), which Thompson Hunt envisioned as a publicly-traded, asset-backed security collateralized by a pool of government-sponsored, mortgage-backed securities.

138.    When acting on Thompson Hunt's behalf, Arnal generally used the alias "Michael J. Cohen."

139.    Arnal used this alias to obscure his criminal indictment and subsequent guilty plea from potential business partners and investors who might be disinclined to partner with or invest in Thompson Hunt if they knew of his history.

140.    Thompson Hunt's prospective revenues were dependent entirely upon fees it anticipated earning as the parent company of the GNMAG Bond's sponsor and depositor.

141.    In 2017, Arnal began recruiting Vaughan to run Thompson Hunt's day-to-day operations.

142.    In or around March 2017, while recruiting Vaughan to join Thompson Hunt, Arnal disclosed his prior criminal indictment and guilty plea to Vaughan and explained to Vaughan that he used the "Michael Cohen" alias in his professional dealings.

143.    In 2018, Arnal hired Vaughan as Thompson Hunt's CEO.

144.    In that role, Vaughan managed day-to-day operations of Thompson Hunt, assisted

Arnal in marketing and communications with potential GNMAG Bond investors, and managed Thompson Hunt's relationships with third parties, such as ratings agencies and banking institutions, to support Thompson Hunt's purported efforts to issue the GNMAG Bond.

145.    From 2018 to the present, Thompson Hunt, through Arnal and Vaughan, have taken steps to try to bring the GNMAG Bond to market, but have to date been unsuccessful.

146.    Among other things, Thompson Hunt has retained securities lawyers, accountants and an underwriter to coordinate the offering and prepare shelf registration statements, secured a financial institution to serve as Trustee for the issuing entity, and obtained credit ratings for the bond from a national bond rating agency (though the rating agency has since withdrawn these credit ratings).

147.    Thompson Hunt and/or its affiliates have also filed several shelf registration statements with the Commission related to the GNMAG Bond, and these registration statements have been declared effective, most recently on June 17, 2021.

148.    Thompson Hunt has not issued the GNMAG Bond, however, because despite years of marketing the bond, Thompson Hunt has never found a willing buyer.

149.    As a result, Thompson Hunt has not earned any revenue to date.

150.    Until around June 2021, Thompson Hunt's efforts to issue the GNMAG Bond were funded privately, principally through an approximately $3.5 million capital injection provided by an associate of Arnal whom he met through his church, and who also sat on Thompson Hunt's Board of Directors.

### B.    Thompson Hunt's Offering

151.    By or around April 2021, Thompson Hunt had exhausted its available cash, and sought to raise capital from outside investors to continue to fund its operations.

152.    To induce prospective investors to invest in the company, Arnal and Vaughan

worked jointly to structure an offering to raise the needed capital for Thompson Hunt (the "Thompson Hunt Offering").

153.    Vaughan and Arnal considered numerous potential investment structures before ultimately approving the use of an investment contract, called a Funding and Profit Participation Agreement (the "Funding Agreement") in or around June 2021, which detailed the offering's terms and provided prospective investors in Thompson Hunt the opportunity to subscribe to the offering.

154.    Arnal had ultimate authority over the terms and content of the Funding Agreement and was responsible for assuring the accuracy of the representations contained in it.

155.    The Funding Agreement claimed that investor funds would be used for a "[c]ash injection to [Thompson Hunt] to maintain the infrastructure and business enterprise known as [Thompson Hunt]."

156.    The Funding Agreement purported to offer investors in the Thompson Hunt Offering both a debt component and a profit participation component in exchange for any capital commitments.

157.    The debt component described in the Funding Agreement entitled investors to a return of their principal (the amounts invested) plus 15% interest within six months, with those sums to be paid by Thompson Hunt out of cash flows generated from the sale of the GNMAG Bond.

158.    The profit participation component entitled investors in the offering to 5% of Thompson Hunt's net operating profits for the period in which the debt component of the investor's commitment remained outstanding.

159.    The Funding Agreement represented to investors that the debt and profit participation components, collectively, would result in an ultimate "repayment amount" to investors of at least three times their capital commitment within six months.

160.    The Funding Agreement also represented that Thompson Hunt's failure to pay this repayment amount in full within six months would result in the accrual of a penalty interest at an annual rate of 24% on any principal remaining outstanding.

161.    The Funding Agreement did not offer investors any rights as to the management of or participation in the business affairs of Thompson Hunt.

162.    Under the Funding Agreement, investor profits earned were to be entirely passive and derived exclusively from Thompson Hunt's efforts in issuing, selling, and managing the GNMAG Bond.

163.    None of the interests created by Thompson Hunt through the Funding Agreement were offered or sold pursuant to a registration statement filed with the Commission, and no valid exemption from registration was applied or even claimed.

164.    The Funding Agreement that Arnal authorized and Vaughan signed contained a series of false and misleading statements concerning Thompson Hunt and its business.

165.    The Funding Agreement described the "Purpose of Funding" as a "[c]ash injection to [Thompson Hunt] to maintain the infrastructure and business enterprise known as [Thompson Hunt]."

166.    As described in paragraphs 229 through 240, below, Thompson Hunt ultimately used investor funds in ways inconsistent with this description, rendering it materially false.

167.    The Funding Agreement represented to prospective investors that Thompson Hunt has a "published patent pending to make GNMAGs available to the general public globally."

168.    In reality, although Arnal had applied for a patent related to mortgage-backed securities, the United States Patent Office had rejected his patent claim on October 5, 2020, and determined that it had been abandoned, due to the lack of any reply by Arnal, on May 3, 2021.

169.    The Funding Agreement also claimed that Thompson Hunt "has a Registered Public

Structure rated Aaa from Moody's."

170.    In reality, while a nationally-recognized ratings agency did rate two series of the GNMAG Bond "Aaa" on prior occasions, the ratings agency repeatedly withdrew its ratings because the GNMAG Bond transaction had not closed.

171.    Each time the ratings agency withdrew its ratings, it informed Thompson Hunt, Vaughan, and/or Arnal of the withdrawal at the time or shortly thereafter.

172.    The last action the rating agency took was to withdraw its rating for the GNMAG Bond on May 11, 2021.

173.    Thus, contrary to the language of the Funding Agreement, the GNMAG Bond was not rated during the Thompson Hunt Offering, which began in June 2021 and, as Vaughan and Arnal accordingly knew or at least recklessly disregarded, the Funding Agreement's representation that the bond was rated "Aaa" was false.

###    C.    Thompson Hunt Offering Marketing Materials

174.    Thompson Hunt prepared and approved a slide deck and other marketing materials for use in soliciting potential investors in the Thompson Hunt Offering (the "Marketing Materials").

175.    Although the Thompson Hunt Offering solicited investments in Thompson Hunt, the presentation Vaughan and Arnal used to market the offering devoted only a single slide to Thompson Hunt itself, with the bulk of the presentation devoted to the investment merits of the GNMAG Bond.

176.    Nowhere in Thompson Hunt's Marketing Materials did Thompson Hunt include Thompson Hunt's financial statements, disclose that Thompson Hunt had never generated any revenue from its operations, or disclose that Thompson Hunt had been trying unsuccessfully to issue the GNMAG Bond for more than four years.

177.    The Thompson Hunt Marketing Materials also contained biographies of Thompson

31

Hunt's board members and executive management.

178.    These biographical descriptions of Arnal referred to Arnal exclusively under his alias, "Michael Cohen," and described "Cohen" as the "Chairman of the Board" of Thompson Hunt and the "primary designer and patent holder of the Public Structure (GNMAG [Bond])."

179.    Arnal did not use his real name in the Marketing Materials, which prevented investors from researching Arnal and learning of his prior criminal indictment for theft and his subsequent guilty plea.

### D.    Artis Forms Brookdale and Contracts with Thompson Hunt to Promote the Funding Agreement

180.    Artis founded Brookdale in 2021.

181.    Although Artis established Brookdale as a legal entity distinct from Growth Point, its ownership structure and business model were substantially the same as Growth Point's.

182.    Artis owned and controlled Brookdale and ran it as a boiler room. He employed Gavzie as an unregistered sales agent on its behalf, used the same aggressive and deceptive sales tactics, and earned commissions from Brookdale's sales agents' sales of securities to many of the same prospective investors Growth Point recruited.

183.    In May 2021, Thompson Hunt engaged Brookdale to market its Thompson Hunt Offering to its investor base.

184.    Thompson Hunt and Brookdale executed a consulting agreement (the "Consulting Agreement") on May 24, 2021.

185.    Artis signed the Consulting Agreement on Brookdale's behalf.

186.    Vaughan countersigned the Consulting Agreement on Thompson Hunt's behalf.

187.    Under the Consulting Agreement, Brookdale agreed to provide "introductions, guidance and assistance in securing funding for" Thompson Hunt.

188.    In return, the Consulting Agreement provided that Brookdale was to receive $15,000

and a 1% equity ownership interest in Thompson Hunt for every $100,000 in investor funds it raised through the Thompson Hunt Offering.

189.    Although the Consulting Agreement contemplated that Brookdale would receive 15% of the money it raised for Thompson Hunt, Artis and Vaughan subsequently renegotiated that up-front commission orally to 25% and confirmed the renegotiated commission levels in an email.

190.    Arnal approved the increase in commission rate to 25%.

191.    The Consulting Agreement also provided that funds Brookdale raised for the Thompson Hunt Offering would be deposited into an escrow account established and maintained by Law Firm A, which served as the escrow agent for all Funding Agreement transactions, and which was the same law firm that Growth Point and Artis was working with in connection with Growth Point's penny stock sales.

192.    The Consulting Agreement directed Law Firm A to pay Brookdale's commissions out of the escrow account.

193.    The Consulting Agreement also provided that, in compensation for its services, Law Firm A would receive 5% of the funds Thompson Hunt raised through the Funding Agreement.

194.    As a result, when Law Firm A's 5% compensation was combined with Brookdale's 25% commissions, Thompson Hunt stood to receive only approximately 70% of the investor funds raised by Brookdale, purportedly for Thompson Hunt, through the Funding Agreement.

195.    Although the Consulting Agreement directed Law Firm A to withhold investor capital to pay commissions to Brookdale, in practice, Law Firm A routed commission payments from the Thompson Hunt Offering either to Growth Point, Artis, or Gavzie.

196.    Though Brookdale and Growth Point were different corporate entities, they shared the same ownership, employees, and business models, and therefore the funds paid by Law Firm A to Growth Point reached the same ultimate beneficiaries.

197.     Shortly after Artis and Vaughan signed the Consulting Agreement on May 24, 2021, Thompson Hunt furnished Brookdale with the Marketing Materials, and Brookdale began soliciting investors on Thompson Hunt's behalf.

198.     Brookdale continued to market and sell the Thompson Hunt Offering to investors through at least April 2023—for almost two years.

**E.     Gavzie's and Brookdale's Fraudulent Marketing of the Thompson Hunt Offering**

199.     Brookdale generally solicited investor interest in the Thompson Hunt Offering through cold calls, targeting many of the same elderly investors to whom Growth Point, Artis and Gavzie had previously sold microcap stocks.

200.     Gavzie was the primary Brookdale salesman responsible for raising funds for Thompson Hunt through the Thompson Hunt Offering.

201.     Gavzie did not interact with Arnal, Vaughan or any other Thompson Hunt agent or employee.

202.     All of Thompson Hunt's communications concerning Brookdale's marketing of the Thompson Hunt Offering were with Artis, Brookdale's sole owner and founder.

203.     Based on the facts alleged in paragraphs 200 to 202, Artis directed Gavzie with respect to the marketing of the Thompson Hunt Offering.

204.     In orally pitching prospective investors to participate in the Thompson Hunt Offering, Gavzie routinely misled investors through false and misleading statements and other deceptions.

205.     Gavzie orally told at least certain investors that they would be investing in a "government bond" or a "government-backed bond."

206.     In reality, investors invested in Thompson Hunt itself, which neither was a government bond nor had any government backing.

207.    Information available to Gavzie, including the Funding Agreements, described the investment as offering equity and debt investments in Thompson Hunt, and not any government bond.

208.    Thus, Gavzie knew or at least recklessly disregarded that investors in the Thompson Hunt Offering were not, as he claimed, investing in a "government bond" or "government-backed bond."

209.    Gavzie orally told other investors that their capital would go to Thompson Hunt.

210.    In reality, as Gavzie knew or recklessly disregarded as a result of his receipt of commissions from his sales of the Thompson Hunt Offering, approximately 30% of the investor funds were used to pay commissions and/or Law Firm A as escrow agent.

211.    Gavzie orally told at least some investors that he would not be making any money on the transaction unless the investors did.

212.    In reality, he and his affiliates received commissions from their sales of the Thompson Hunt Offering regardless of how the investment performed, as Gavzie knew because he personally received sales commissions.

213.    Gavzie orally told at least some investors that he personally had invested in the Thompson Hunt Offering.

214.    In reality, Gavzie never invested in the Thompson Hunt Offering.

215.    Gavzie also emailed the Marketing Materials—which contained the misrepresentations and falsehoods detailed in paragraphs 178 to 179 above—to at least some prospective investors after they expressed preliminary interest in participating in the Thompson Hunt Offering.

216.    Gavzie also regularly characterized the Thompson Hunt Offering as a "safe" investment during his oral solicitations of investors.

217.    At no time did Gavzie inform potential investors in the Thompson Hunt Offering that Thompson Hunt had no history of generating *any* operating revenue. Nor did Gavzie tell investors that Thompson Hunt had been attempting to launch the GNMAG Bond—the supposed source for the promised, imminent 300% returns—for several years without success.

218.    The information described in paragraph 217 would have been evident from a review of Thompson Hunt's basic financial information which was available to Gavzie.

219.    Gavzie therefore knew, or was reckless in not knowing, that an investment in Thompson Hunt Offering was risky and speculative and that his representations regarding the investment as "safe" was materially false or misleading.

220.    Gavzie generally provided prospective investors who agreed to invest in the Thompson Hunt Offering with a copy of the Funding Agreement for execution, conformed to reflect the investor's particular commitment amount.

221.    The Funding Agreements that Gavzie provided prospective investors contained the misstatements detailed in paragraphs 164 to 173 above.

222.    The Funding Agreements Gavzie provided to prospective investors also contained the representation described in paragraph 165, above, which claimed that the purpose of the investors' funding was for a "[c]ash injection to [Thompson Hunt] to maintain [Thompson Hunt's] infrastructure and business enterprise."

223.    In reality, 25% of the investors' funds were directed to Growth Point, Artis, and/or Gavzie as commissions, and an additional 5% retained by Law Firm A, as the escrow agent, as Gavzie, Artis, Arnal and Vaughan knew or recklessly disregarded as the recipients (or payors) of these sales commissions.

224.    Upon receipt of an investor's signed Funding Agreement, Vaughan countersigned each investor's Funding Agreement on Thompson Hunt's behalf.

225.    Arnal notarized Vaughan's signature on each executed Funding Agreement under his own name, not "Michael Cohen."

226.    The Funding Agreement referenced Arnal only in his capacity as a notary and did not indicate that Arnal was Thompson Hunt's Chairman or that he and "Michael Cohen" were one and the same.

227.    In total, between May 2021 and April 2023, Brookdale raised approximately $1,350,750 from approximately 30 investors on Thompson Hunt's behalf through the Thompson Hunt Offering, the vast majority (if not all) of whom Gavzie solicited personally.

228.    Neither Brookdale nor Thompson Hunt took any steps to assess, in connection with the Thompson Hunt Offering, whether these investors—many of whom were senior citizens—were accredited investors.

**F.    Thompson Hunt Misappropriates the Thompson Hunt Offering Proceeds**

229.    Contrary to the representation in the Funding Agreement regarding the use of proceeds, most of the funds raised in the Thompson Hunt Offering were neither used to inject cash into Thompson Hunt nor to maintain its business or infrastructure.

230.    Rather, Thompson Hunt diverted funds and used them for purposes unrelated to Thompson Hunt's business or the GNMAG Bond Offering, including, among others, to pay sales commissions, to pay the legal fees of Arnal's friend, and to partially pay off promised returns owed to earlier Thompson Hunt Offering investors.

231.    Vaughan had signatory authority over Thompson Hunt's bank account and authorized the dispersion of funds in the manner described below at the direction of Arnal.

232.    Of the approximately $1,350,750 Brookdale raised in the Thompson Hunt Offering, about $405,167 was either retained by Law Firm A as escrow agent ($67,480) or routed to Growth Point, Artis, and/or Gavzie as commissions ($337,687).

233.    Arnal directed that Vaughan pay an additional, approximately $188,258 of funds raised from investors in the Thompson Hunt Offering to fund the legal defense of a friend of Arnal's who faced federal criminal mail and wire fraud and money laundering charges in the District of Nebraska.

234.    In connection with that criminal proceeding, Vaughan admitted, and the District Court in Nebraska found, that investors recruited to participate in the Thompson Hunt Offering were not told that their monies would be used for that purpose. *See United States v. Voight*, No. 4:18-CR-3143, 2022 WL 2342663, at *3 (D. Neb. June 29, 2022).

235.    Arnal and Vaughan also directed Thompson Hunt to use approximately $369,700 of the funds raised in the Thompson Hunt Offering to make Ponzi-like payments to earlier Thompson Hunt Offering investors.

236.    Arnal and Vaughan made these payments in consultation with Artis to mollify investors who had expressed discontent that the promised principal and interest payments had not been timely made.

237.    Artis told Vaughan which investors to make payments to out of the funds raised by the Thompson Hunt Offering, based primarily on which investors most loudly complained about the failure of the Thompson Hunt Offering to generate its promised returns.

238.    Having reviewed the Funding Agreement (and, as to Arnal and Vaughan, having approved and signed the Funding Agreement), Arnal, Vaughan and Artis knew or recklessly disregarded that the Funding Agreement represented to investors that their funds would be used to develop Thompson Hunt's business.

239.    Arnal, Vaughan and Artis also knew or recklessly disregarded that the Funding Agreement claimed that any profits from the Thompson Hunt Offering would be paid out of proceeds Thompson Hunt earned from the sale, issuance, and management of the GNMAG Bond.

They thus knew, or recklessly disregarded, that Thompson Hunt's use of new funds raised in the Thompson Hunt Offering to pay earlier investors was contrary to the Funding Agreement's representations.

240.    In total, of the approximately $1,350,750 raised in the Thompson Hunt Offering, approximately $1 million was misappropriated in the manners described above.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

241.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

242.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

243.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

244.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

245.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

246.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and 5(c)
### (Thompson Hunt, Arnal, Vaughan, Brookdale, Artis and Gavzie)

247.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 5 through 8 and 135 through 240.

248.     Thompson Hunt, Arnal, Vaughan, Brookdale, Artis and Gavzie, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had

been filed.

249.    By reason of the foregoing, Thompson Hunt, Arnal, Vaughan, Brookdale, Artis and Gavzie have violated and, unless enjoined, will again violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77(e)(a) and 77(e)(c)].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act 15(a)
### (Brookdale, Growth Point, Artis and Gavzie)

250.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

251.    Brookdale, Growth Point, Artis and Gavzie, while not registered with the Commission as a broker or dealer or associated with a registered broker or dealer, made use of the mails or other means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities other than exempted securities or commercial paper, bankers' acceptances or commercial bills.

252.    By reason of the foregoing, Brookdale, Growth Point, Artis and Gavzie have, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Arnal)

253.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 5 through 8 and 135 through 240.

254.    As alleged above, Vaughan violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

255.    Arnal knowingly or recklessly provided substantial assistance to Vaughan with respect to Vaughan's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

256. By reason of the foregoing, Arnal is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Vaughan's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Arnal will again aid and abet these violations.

### SIXTH CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
#### (Arnal)

257. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 5 through 8 and 135 through 240.

258. As alleged above, Vaughan violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

259. Arnal knowingly or recklessly provided substantial assistance to Vaughan with respect to Vaughan's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

260. By reason of the foregoing, Arnal is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Vaughan's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Arnal will again aid and abet these violations.

### SEVENTH CLAIM FOR RELIEF
#### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
#### (Vaughan)

261. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 5 through 8 and 135 through 240.

262. As alleged above, Arnal violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

263. Vaughan knowingly or recklessly provided substantial assistance to Arnal with respect to Arnal's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

264.     By reason of the foregoing, Vaughan is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Arnal's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Vaughan will again aid and abet these violations.

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Vaughan)

265.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 5 through 8 and 135 through 240.

266.     As alleged above, Arnal violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

267.     Vaughan knowingly or recklessly provided substantial assistance to Arnal with respect to Arnal's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

268.     By reason of the foregoing, Vaughan is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Arnal's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Vaughan will again aid and abet these violations.

## NINTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Gavzie)

269.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

270.     As alleged above, Thompson Hunt, Arnal and Vaughan violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

271.     Gavzie knowingly or recklessly provided substantial assistance to Thompson Hunt, Arnal, and Vaughan with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. §

77q(a)(2)].

272.    By reason of the foregoing, Gavzie is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Thompson Hunt's, Arnal's and Vaughan's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Gavzie will again aid and abet these violations.

### TENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Gavzie)

273.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

274.    As alleged above, Thompson Hunt, Arnal and Vaughan violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

275.    Gavzie knowingly or recklessly provided substantial assistance to Thompson Hunt, Arnal, and Vaughan with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

276.    By reason of the foregoing, Gavzie is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Thompson Hunt's, Arnal's and Vaughan's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Gavzie will again aid and abet these violations.

### ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Artis)

277.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

278.    As alleged above, Thompson Hunt, Arnal, Vaughan and Gavzie violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

279.    Artis knowingly or recklessly provided substantial assistance to Thompson Hunt, Arnal, Vaughan and Gavzie with respect to their violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

280.    By reason of the foregoing, Artis is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Thompson Hunt's, Arnal's, Vaughan's and Gavzie's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Artis will again aid and abet these violations.

## TWELFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Artis)

281.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

282.    As alleged above, Thompson Hunt, Arnal, Vaughan and Gavzie violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

283.    Artis knowingly or recklessly provided substantial assistance to Thompson Hunt, Arnal, Vaughan and Gavzie with respect to their violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

284.    By reason of the foregoing, Artis is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Thompson Hunt's, Arnal's, Vaughan's and Gavzie's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Artis will again aid and abet these violations.

## THIRTEENTH CLAIM FOR RELIEF
### Control Person Liability under Section 20(a) of the Exchange Act
### (Artis)

285.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 240.

286.     As alleged above, Defendants Brookdale and Growth Point violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by, among other things, making material misrepresentations and omissions and employing deceptive devices to induce the sale of securities in Thompson Hunt and other microcap issuers.

287.     At all relevant times, as the sole owner and President of Brookdale and Growth Point, Artis participated in, and exercised control over, the operations of Brookdale and Growth Point, and also possessed the power and ability to control the acts constituting Brookdale's and Growth Point's violations of the securities laws alleged herein.

288.     Artis was a culpable participant in Brookdale's and Growth Point's violations of Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

289.     By reason of the foregoing, Artis, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], is jointly and severally liable with, and to the same extent as Brookdale and Growth Point for their violations of Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendants Thompson Hunt, Arnal, Vaughan, Brookdale, Artis and

Gavzie and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77(e)(a) and 77(e)(c)];

### III.

Permanently enjoining Defendants Brookdale, Growth Point, Artis and Gavzie and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];

### IV.

Ordering Defendants Thompson Hunt, Arnal, Brookdale, Growth Point, Artis and Gavzie to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

### V.

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### VI.

Permanently prohibiting Defendants Artis and Gavzie from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

### VII.

Permanently prohibiting Defendants Artis, Arnal and Vaughan from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15

U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. §

78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section

21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## VIII.

Granting any other and further relief the Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.


Dated:  New York, New York
        August 8, 2024

<div style="margin-left:40%;">

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Sandeep Satwalekar
Jacob David Zetlin-Jones
William Conway
Nicholas Karasimas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0978 (Zetlin-Jones)
zetlinjonesj@sec.gov

</div>